May it please the Court, Ashfaq Chowdhury on behalf of Rio Young. I'll watch the clock, Your Honours, but I'd like to try to reserve one minute for rebuttal. Your Honours, the question here, as in United States v. Craighead, is whether the search and interrogation by such a police-dominated atmosphere that the interrogation was custodial in nature and therefore required Miranda warnings. And I want to focus on the Craighead case and the uniqueness of that case. That case, the first line of that case is that the home occupies a special place in the pantheon of constitutional rights. And the Court, the Court goes through the first amendment. Does the home include the garage? Yes, Your Honour. Does the home occupy the garage? No, Your Honour. In Craighead, the room was a storage room attached to the house, and here it was a garage attached to the house. So I do believe that the garage here, which was attached to the home by a door, and that's clear from the record, is part of the home. I don't think there's any indication in the case law that I'm aware of that the garage is not part of the home. It is attached to the home, it's used by the occupants of the home. There are materials from the home in the garage. It's one connected structure. I believe it is part of the home, Your Honour. Your client was told he was free to leave, right? Yes, Your Honour. He was told he was free to leave. He wasn't in handcuffs? He was not in handcuffs. Or manacles on his feet, right? No, that is correct, Your Honour. He was not restrained in any way? He was physically restrained, Your Honour, outside on the sidewalk. Not when they were talking? Not when they were talking, that is true. Not in the garage when they were talking. And, Your Honour... I mean, and for all we know, if he'd gotten up and said, sorry guys, I don't feel like talking today, I'm leaving, presumably he would have maybe get up and let go, and left, right? Well, Your Honour, and I think that is the question, and the reason I wanted to focus on Craighead is that Craighead recognizes very clearly that the usual inquiry into whether the suspect reasonably believed he could leave the interrogation does not quite capture the uniqueness of an interrogation within a suspect's home. And the court in that case asked, where will he go? Six in the morning, when he's barefoot, doesn't have his glasses, and the court goes on to say, when applying the Miranda to the task of sorting a non-custodial home interrogation from a custodial one, our analysis considers the extent to which the circumstances of the interrogation... Do we know whether he had car keys, wallet, shoes? The record... I mean, let's say he wanted to go to an all-night Denny's. Yes, Your Honour, the record is clear that he didn't have his shoes on, and there is no evidence about car keys or whether he was able to drive. Your Honour, my point as to the statement from Craighead is that the focus that the court makes there is on the police-dominated atmosphere, and that is what the court calls the benchmark. And the reason the court does that is because it recognizes that being told to leave when your house is completely in a police-dominated atmosphere rings somewhat hollow. How can you feel free to leave if you are not even sure you can ask the officers to leave the home? The court in Craighead notes, how can you feel free to terminate the interrogation if you're not even free to invite others into your home? And here, I would like to emphasize that under this test of the police-dominated atmosphere test that's set out in Craighead, I think the record here, and we're not disputing facts, is pretty clear. You have 12 armed officers. You have five on the entry team. They have guns out. You have the guns pointed at Mr. Young and his mother for 10 to 20 seconds in the dark. Mr. Young is taken outside in his underwear, barefoot, held physically restrained on the public sidewalk, brought back in. He's handed clothes by the officers. They say, here's a shirt and a pant. They're told, the mother and Mr. Young are told, we're going to separately interrogate you. He's isolated from his mother. He's taken into this ad hoc interrogation room that the officers set up. Just as in Craighead, they grab a chair from somewhere else. It's not a living space. Just as in Craighead, the storage room was not a living space. Excuse me, because we are familiar with the facts on this. Would you say that whenever the police, there's multiple police officers in a house, that any questioning of a person who lives in that house is custodial, is in custody? No, Your Honor. I would not. What would be different that where you would say there were 12 police in a house, somebody questions a person in the house, what would make that not in custody in your view? Yes, Your Honor. And recognizing, as the court says in Craighead, that these are all very fact-specific, fact-dependent questions, I think to answer Your Honor's question, I think where you have a situation where there isn't a display of force, where guns are not pointed at suspects. The guns weren't pointed at this person, right, when they were in the garage. So there were no guns pointed. So you're saying at any point in the search, if guns are pointed, that makes it custodial? Well, Your Honor, it's a totality of the circumstances test. It's not a single factor. But as this court said in Craighead, if force or physical restraint is used at any time, and that's the question, and I think that distinguishes this from the Howes v. Fields case that the government relies on in the prison context. So if the police do a search, and normally they would come in and do a protective sweep and look with their weapons. So in any of those cases, questioning a person in the house, who lives in the house, would be custodial. Is that your position? No, Your Honor, that's not my position because there are the other factors I would point to. The other factors are, and I know the court is familiar with the record, that they were constantly kept within sight and supervision of the officers, that the interrogation was in a non-living space. It wasn't on the couches in some of these other cases. He was isolated from his mother. That's not the case in some of these other cases. He was confronted with evidence against him. And all of these are factors in Craighead and in Kim, Your Honor, that go into this totality of the circumstances test. So there's other factors that the government cites, which they say go to voluntariness, like he went voluntarily with the officers, the door was open, they weren't barring the way. So they cite all these factors. So why aren't we just looking, since it's a totality of the circumstance and you don't have a bright line rule, why wouldn't we defer to the district court here? And it's consideration of these factors. Because Your Honor, I think the parties agree it's a de novo standard. And it is a de novo standard. The factual findings, it's a plainer standard, but the determination on those undisputed factual findings is a de novo standard, I would say, is a question of law. So that's why I would say this court is not required to defer to the district court's determination on that question of law, of whether a reasonable person would feel free to leave, a question of law, and whether this was a police-dominated atmosphere, which I would argue under Craighead is a question of law on these facts. And Your Honor, so I know we've talked about the factors, but I would say it's not a bright line rule. And it is a number of factors, as Craighead sets out. It says it's not exhaustive. But under those factors, just trying to apply the most relevant case from this court in a unique situation, an in-home interrogation, which as the court recognized in Craighead that was a question of first impression there, we have a unique body of law here in the Ninth Circuit as to when an in-home interrogation becomes custodial. Craighead guides us there. There are some differences, I agree. But the government also cites Casares, a recent decision in Casares. Yes, Your Honor. And I think the difference in Casares, I think the record there does not suggest that guns were pointed. But also, like Crawford, that case involves an initial entry into the house with many officers, et cetera, but then an invitation to go to an FBI office. As in Crawford and in Casares, there's a break and the court finds that there's a break where the detention, any detention ends or custodial situation ends at the house and they say, well, come with us and there's some question. And the district court finding was that there's an option. You can drive to the FBI office and it's 30 minutes away. And there, there's a clear break. Here, there was no break. It was continuous, as in Craighead. The police-dominated atmosphere remained the entire time. The suspect and his mother remained in the house, which was filled with officers and officers outside, testimony is clear, who were instructed not to allow anyone else to come in. And they were explicit, if you can't come back, they say you're free to leave, but you can't come back, which I think along with the other factors is maybe the most explicit statement of police-dominated atmosphere. We've taken over your home. And that's why I come back to my first point. Craighead recognizes the home is the most constitutionally protected place on earth. And when the police come in and take over your home and you have nowhere else to go to, I don't know where he's to wander off to at 6 a.m. If you have nowhere else to go to, that's a different situation than a situation in a prison, than a situation at a cell. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Alison Westphal-Kong for the United States. Before making incriminating statements to law enforcement, defendant was advised that he was not under arrest at least three times, that he was free to leave at least twice. And given these advisements, it's not surprising that... Where would he go in bare feet with a note? He can't go back in the house and get shoes or his wallet, keys, or anything else? Well, I don't think the record reflects that. And in fact, in Agent Cecil's declaration, he talked about how on prior search warrants he's participated in, individuals in the home have taken showers, gotten their clothes. So there's no indication that defendant would have been prevented from getting his... I'm sorry, he would have been able to go to somebody else's home for a shower? No, the Agent Cecil... Is there evidence here? I mean, what we know is that he was arrested or he was found in his underwear. Initially, that's true. At 6 a.m. when they came into the house, he was in his underwear. You're agreeing with me, right? Yes. And then he was handed a shirt and a pair of pants? That's correct. Is there any evidence that he was handed anything else? That he had access to his keys, to his wallet, to his shoes, anything else like that? He was not handed any of those items, no. Where would he go barefoot and without any money, ID, car keys? Where would he go? I guess my point was that Agent Cecil's declaration suggests that in prior search warrants, the officers have had no problem with individuals taking showers in their own homes, getting their clothes and leaving. Did they tell him that? Did they say, oh, you know, you can go and take your shower, you can get your stuff if you want, anything like that? No, they didn't tell him that. They told him that he could leave at any point. What's Agent Cecil's declaration as to what he did in other cases? What good does that do us here? It just demonstrates that... So he's a swell guy? Well, I think it demonstrates that had the defendant asked, had the defendant indicated that he did want to leave but that he needed his shoes, there's no indication that the agents would have had any problem getting his shoes. He never asked for his shoes, he never asked for his glasses. Is he supposed to read their minds? Well, no, but he's allowed to. They hand him what they hand him. They find him in his underwear and they hand him a couple things and then they say, we want to talk now. They say, oh, if you want more stuff, we'll get you more stuff. If you want to take a shower, you can go take a shower. We'll bring you keys. There's your car, you can take it. There's nothing like that, right? This is all in the agent's mind. That's true, but I guess given... He's a swell guy, written on his jacket. Well, I think given the non-confrontational nature of their interaction as evidenced by the ultimate recording... No, no, they don't call confrontation that starts by having your door broken and having a bunch of people pointing guns at you while you're standing in your underwear as being a non-confrontational nature. I mean, I think that's a little much. Well, I think that the recording demonstrates that by the time of the interview, it was such that the defendant could have said he wanted his shoes, or he could have just gone to the living room, said, I don't want to talk to you, and sat on his couch, taken a walk. There are a lot of... I'm sorry, was he allowed to go back in the house? Yes. There were other agents that were there, and so he would have been monitored. I thought it was clear he was not to be in the house. The testimony was that if he left the house, he could not come back until they were done. But his mother and the defendant, they did stay in the house the entire time, and they were sitting in the living room couch. He was told if you leave, you can't come back in. He was told if he left the house, he could not come back into the house until it was done. I don't think he was told he could not leave the garage. He could go back to the living room with his mother. Could you address, you circulated Casares, and Craig Head is pretty strong case, coming close to saying where there's a police-dominated atmosphere, probably you're in custody. Casares is a little hard to understand, but it did seem to say that police-dominated atmosphere, questioning in the house, and Matt wasn't in custody, because it did identify that. Can you tell me how it would apply here and whether it's, what the totality of circumstances, what we can glean from that case? Well, I think in that case, you're correct that he was also interviewed in his home, so it's not just a matter of the subsequent interview from the police station. In that case, I mean, they also had, they ultimately also had a recording, and I think that that was an important part of the analysis. Did they have one in the home or just in the, when he was in there? They may have just had one at the ultimate police station, but in his home, he was separated from his family to be interviewed. There were 10 officers, so I think there are some unique facts of Craig Head that were not present in Casares and are not present here, and one of them is that in Craig Head, the defendant was unquestionably a suspect from kind of the time they enter the house. He's the only one there. He's the only one they're interested in interviewing. They bring his sergeant superior with them, giving the impression that he's in trouble and about to be punished, and in both Craig Head and Casares, there are other people in the house, and in this case in particular, the agents make clear from the beginning that they're interested in interviewing both defendant and his mother, and so, and they ask defendant questions about his mother during the initial interview before the ultimate confession, suggesting that he's not necessarily the focus of the investigation. I also think that Craig Head, a very important point in Craig Head had to do with the three agencies and the appearance that they were not acting in coordination, such that if one officer allowed Craig Head to go, the others would not, and in this case, while there were two agencies represented, there were only, you know, two officers from the district attorney's officers were with the Secret Service, but both the district attorney's investigator and a Secret Service agent was present for the interview with defendant, and so when Agent Cecil told defendant for a second time, you know, as I told you before, you can leave at any time. You're not under arrest. The investigator was right there with him, and so a reasonable person would not conclude that the agencies weren't acting in coordination and that Agent Cecil wasn't speaking for both of those agencies, and the defendant actually testified that he thought all of the officers were with the Secret Service. Counsel, I was a little surprised to see the Secret Service involved in this search. Is that because the Secret Service is now part of HSI? No, Your Honor. I believe that the Secret Service has, is kind of scaling back on its child pornography investigations, but this was a part of what they were doing, and these agents were part of a specific task force working with other agencies on child exploitation offenses. And then also I just want to emphasize a big difference between Craighead is that we do have a recording here, and in Craighead, the court doesn't really discuss the character of the interview as being a factor that's significant, and I would, I would suggest that that's because there wasn't a recording for either the district court or this court to look to, and the recording was a critical factor in this court's decision in Bassignani in demonstrating that it was non-confrontational and non-coercive, kind of notwithstanding perhaps the initial circumstances, which as Judge Kaczynski correctly noted, probably cannot be characterized as non-confrontational, but ultimately it was non-confrontational. And I think the recording... What was the lapse between the time they broke in the door and the time they sat down to talk? What time period? So the specific time period is not in the record, but it was... The record is that right after... So during the protective sweep, and his hands are behind his back, Agent Rangel tells him you're not under arrest. At the end of the protective sweep, about three minutes, he invites him back to his home with his mother, and they're sitting on the living room couch. And at that point, they're first introduced to Agent Cecil, who first explains, we're here to conduct a search warrant. You're not under arrest. You're free to leave at any time, but we would like to talk to you individually. So I think that not a lot of time passed. But given the change in circumstances, the fact that... At some point, he was given some clothes. Oh, that's true. He was given clothes when they entered the living room before he sat on the couch with his mother. That's true. So we're talking 20 minutes? So it's now 6.20? I think that's a reasonable inference, but the specific time was not on the record. Come, give me a number. 6.30? Well, they ultimately leave at 7.20, and they also briefly interviewed the mother, so I think 6.20 would be a reasonable inference, yes. And do we know what time of year it is? It was March of 2013. Would it have been dark, 6.20? I don't know. Something that can be looked up in the almanac, I suppose. Yes, that's correct, Your Honor. And the final thing I want to say is, the defendant focused on isolation. I guess the answer is, whether he was free to leave or not, there's a separate point that he's free not to talk. Right. He can just say, I'm not going anywhere, but I'm not talking to you guys. That's correct. So he wasn't specifically advised, you don't have to talk to us, but I think that was a fair reading of what Agent Cecil said. And the final thing I want to say is that the fact of isolation in itself shouldn't necessarily support a finding of custody, because here it doesn't appear that the defendant would have necessarily felt more at ease had his mother been there, given the topic that was being discussed, and given that at the end of the interview, he expressed concern about the agent talking to his mother. Thank you, Your Honors. Thank you, Your Honor. Just two points very briefly. In Cazares, if the court looks, the pre-trial motion that was filed to suppress was only as to the statements at the police station. It was not a motion to suppress the statements in the home, so the entire question there was whether the statements at the police station should be suppressed. And as discussed earlier, we think that's an entirely separate situation. There's a complete break. Is that before us? I'm sorry, Your Honor. Is that question before us? The question as to... Suppression of the statements. Yes, here the question is to the suppression of the statements made in the garage. Yes, Your Honor. I think you were citing Cazares as a way to distinguish it. Yes. Correct. Yes, that's my point. Thank you, Your Honor. The second point I would say is... No, no, you didn't answer my question. Yes, Your Honor. Are the statements at the police station before us? In Cazares? Here. No, there was... No, Your Honor. There was... Here, to be clear, there was a March 2013 interrogation in the garage. I know the facts. There was an interrogation, and then there was the polygraph test, and he made statements afterwards, right? Yes, Your Honor. The district court did not rule on the afterwards statements. Yes, Your Honor. I'm asking, is that issue before us? Yes, Your Honor. It is a secondary issue that we have raised. That relies on voluntariness, and we recognize that the voluntariness test is much more difficult. So my focus here, Your Honor, is on the statements made in March 2013 at the home. My final point would be, as to the isolation... You managed to say a lot of words without answering my question. It is before us. Is it before us? Yes, Your Honor. I know you'd like us not to decide it. You'd like us to decide... But if we rule in your favor, if we rule against you on the initial statements, it doesn't matter, right? And then it may be before us, but it's essentially moved. If we were to rule in your favor on the first point, there would still be the question of... The consequence would be that he'd get to withdraw his guilty plea, and then the statements at the police station would come into play. So... Right? Yes, Your Honor. And I can address that... So I have to rewind this up for you? I thought you would know. Thank you, Your Honor. So let me get back to the question I asked. Yes. Is the question of the statements, the legality of the statements at the police station before us? Yes, Your Honor. And as to the statements, one crucial difference. Those statements focus on alleged allegations of touching. Those statements do not focus on control of the computers and downloading. And in the record, the district court suggests that he is likely to exclude those statements. We had moved to exclude those under 403. We think they're irrelevant to the federal charges of possession and receipt here. So, Your Honor, the statements are very different, and those statements are not as pertinent to the actual charges here. This all matters for me, man. What about us? Do we have anything to rule on those statements? Your Honor, we have raised the argument that those statements... You just don't seem very confident of that argument. Is this what's going on? To be frank, I'm... You don't want to get there because you think you're going to lose, right? Well, Your Honor, to be frank, I am less confident on that argument. The voluntariness argument is very difficult. The final point I would make is on isolation. The government argues that Mr. Young may have been sensitive or shy or ashamed to talk. Our point is also he may have, as Miranda points out, if you have support with you, you may have greater strength to resist the government's or the agent's urging to talk. Or maybe he would have been less likely to admit in front of his mother that he was downloading porn. Yes, Your Honor. It may not have been support. It may have been counter support. It may have been... And he may not have made the statements is our point. Thank you. Okay, thank you. Case is argued. We'll stand for a minute.
judges: Kozinski, Ikuta, Owens